John W. BAKER and Susan
Baker, Plaintiffs,

v.

Trudy COXE, Thomas W. French, Jay
Copeland, Patricia A. Huckery, Brad-
ford G. Blodget, Jane W. Mead, Susan
F. Tierney, and Janet G. McCabe, De-
fendants.

No. Civ.A. 95–12477–PBS.

United States District Court,
D. Massachusetts.

June 8, 1999.

Robert H. D'Auria, Bedford, MA, for
John W. Baker, plaintiff.

Richard H. Spicer, Lucy A. Wall, Attor-
ney General's Office Trial Division, Boston,
MA, Douglas S. Brown, Attorney's General
Office, Admin. Law Div., Boston, MA,

Scott Hill–Whilton, Assistant Attorney General, Government Bureau Trial Division, Boston, MA, for Janet G. McCabe, Thomas French, Jay Copeland, Patricia Huckery, Bradford G. Blodgett, Jane Meade, defendants.

## MEMORANDUM AND ORDER

SARIS, District Judge.

### INTRODUCTION

This case concerns a proposed pier construction project on the northern end of Clark's Island, in Plymouth Harbor Massachusetts, and the pier's neighboring heronry. Plaintiffs John and Susan Baker privately own land on Clark's Island and, in May 1991, applied for a permit to build a pier on their land. In a suit under 42 U.S.C. § 1983 for violation of the First Amendment, they allege that eight defendants, current and former employees of the Massachusetts Executive Office of Environmental Affairs ("EOEA"),[1] delayed the approval of their project in retaliation for their political opposition to environmental legislation and their litigation against a prominent scientist who negatively reviewed the Bakers' activities. Defendants have moved for summary judgment on the ground that there is insufficient evidence to establish the essential elements of the claim or to call into question the legitimacy of their asserted nonretaliatory reason for pursuing environmental review of the project. They claim they were motivated by concern for thousands of colonial nesting birds, primarily herons and egrets. Defendants also seek to dispose of plaintiffs' pendant state law claims on summary judgment.

After hearing and for the reasons set forth below, the motion for summary judgment is **ALLOWED** with respect to plaintiffs' First Amendment claim. The pendant state claims are dismissed without prejudice.

### FACTUAL BACKGROUND

When all reasonable inferences are drawn in favor of the nonmoving party, the relevant facts are as follows:[2]

Since 1986, the Bakers have owned a number of acres of land on Clark's Island in a forestry trust. The purpose of the trust was to protect the ninety-acre island from development and to operate a tree farm. The Bakers' land also contained a heronry site.

For some time, the Bakers allowed members of the Manomet Bird Observatory ("MBO") to study the local heronry on their land. However, in April 1989, the Massachusetts Legislature considered legislation (Bill # 1105) that would have classified a tract of land, including the Bakers' property, as an Area of Critical Environmental Concern ("ACEC"). Land situated in an ACEC would be subject to use restrictions and, as such, would decrease in value. Mr. Baker was opposed to the legislation insofar as it related to his land. When the Bakers learned of the MBO's support of the ACEC designation, they denied the organization further access to their Clark's Island property. Prior to the rescinded permission to observe and study the heronry, no MBO employee had indicated to the Bakers that their tree farming

---

1. The defendants are: Trudy Coxe, Secretary of the EOEA; Thomas French, Director of the National Heritage and Endangered Species Program ("Natural Heritage"), a division of the EOEA's Division of Fisheries and Wildlife; Jay Copeland, an environmental reviewer with Natural Heritage; Patricia Huckery, also an environmental reviewer with Natural Heritage; Bradford Blodget, State Ornithologist and EOEA employee; Jane Mead, Director of the Massachusetts Office of Coastal Zone Management; Susan Tierney, former Secretary of the EOEA; and Janet McCabe, former Assistant Secretary for Environmental Impact Review.

2. A detailed statement of facts can also be found in this Court's September 20, 1996, Memorandum and Order, *Baker v. Coxe*, 940 F.Supp. 409 (D.Mass.1996), which allowed in part and denied in part defendants' motion to dismiss.

had an adverse impact on the Island birds or habitat. The proposed ACEC legislation never materialized.

On May 15, 1991, approximately two years later, the Bakers applied for a permit with the United States Army Corps of Engineers to construct a pier on the northern end of Clark's Island. The Army Corps required that the Massachusetts Office of Coastal Zone Management ("CZM") complete a consistency review before it would issue the permit. It notified various environmental agencies of the proposal. On May 28, 1991, Mr. Baker filed a notice of intent certifying that the activity would be consistent with the CZM Program. One or more copies of this so-called Consistency Statement were sent to CZM. On June 4, 1991, Grant Kelly of the Army Corps of Engineers informed the Bakers' project manager, Robert Alvarez, that the Army Corps would issue a Letter of Permission authorizing the Bakers to proceed with construction of the pier. However, subsequent to the May 1991 filing of the pier application, the Natural Heritage and Endangered Species Program ("Natural Heritage") defendants (Huckery, Copeland, Blodget, and French) initiated a review of the project.

At the request of Copeland, an environmental reviewer who indicated that more time was needed for the EOEA's review, the Army Corps did not issue a Letter of Permission and informed Alvarez that the project was too controversial for the Letter. On September 26, 1991, the Army Corps issued a Public Notice describing the proposed pier project and seeking public comment in order to evaluate properly the pier permit application.

On October 21, 1991, defendants Copeland and Blodget, accompanied by Alvarez and by representatives of the United States Environmental Protection Agency, the United States Fish and Wildlife Service, and the Army Corps, visited the proposed pier site in order to assess the pier's impact on the nearby heronry. During the site visit, Copeland and Blodget observed that the nesting area had been largely destroyed. Large piles of brush appeared to be cut, and "concealing vegetation" was roughly mowed.

After viewing this decimation, the Natural Heritage defendants say they determined that the pier permit application submitted by the Bakers should be opposed in order to permit revegetation. The defendants solicited scientific support for their position from Dr. Katharine Parsons, an MBO employee and authority on the Clark's Island heronry. On October 23, 1991, Dr. Parsons responded with a letter to the EOEA detailing the historic and regional significance of the Clark's Island heronry. In order to drum up additional support for its position, the EOEA shared Dr. Parsons's letter, which focused on the adverse effects of the Bakers' tree farming and brush clearing activities, with numerous federal and state agencies, as well as with private citizens of the Commonwealth.[3] Dr. Parsons informed Copeland that she had personally witnessed mowing in breeding areas and dead birds a couple of years earlier.

Natural Heritage, a division of the Massachusetts Division of Fisheries and Wildlife, sent a letter dated November 8, 1991, to the Army Corps of Engineers, opposing the pier permit application on the ground that construction of the pier and the tree farming activities it would facilitate "would be absolutely incompatible with the restoration of the wading bird habitat." (Letter from Wayne MacCallum, Director of the Massachusetts Division of Fisheries and Wildlife, to Army Corps of Engineers of 11/8/91, at 4.) The United States Environ-

---

**3.** Defendant Blodget also contacted Christopher Dowd, an officer of the United States Fish and Wildlife Service, to request the Service to investigate alleged violations of the Migratory Bird Treaty Act, 16 U.S.C. § 703 *et seq.*, in connection with the heronry. No criminal prosecution ever resulted. However, this criminal investigation instigated by some of the defendants ratcheted up the acrimony in the case.

mental Protection Agency and Fish and Wildlife Service sent similar letters.

On December 2, 1991, the Bakers threatened to file suit against Dr. Parsons and the MBO, alleging that Dr. Parsons' October 23 letter contained false and defamatory statements. Dr. Parsons requested and received assistance with the Baker litigation from the defendants. On January 11, 1996, the superior court granted Dr. Parsons's Special Motion to Dismiss pursuant to Mass.Gen.L. ch. 231, § 59H, finding that the lawsuit constituted an impermissible SLAPP (Strategic Litigation Against Public Participation) suit. *See Baker v. Parsons*, No. 93–3212 (Mass.Super.Ct. Jan. 11, 1996).

In the meantime, the Natural Heritage defendants continued aggressively to pursue the possibility of environmental review of the pier project. The Bakers' pier did not categorically fall under Massachusetts Environmental Policy Act ("MEPA") review, Mass.Gen.L. ch. 30, §§ 61–62H. A project that does not meet the threshold criteria for automatic MEPA review can nonetheless become subject to such review through the Act's Fail–Safe provision. *See* 301 C.M.R. § 11.04. Three procedural avenues exist to qualify a project for MEPA review under the Fail–Safe provision. MEPA scrutiny is triggered (1) upon request of two or more agencies, (2) upon request of ten or more persons, or (3) at the initiative of the Secretary of Environmental Affairs. *See id.*

The defendants unsuccessfully sought support from two state agencies (including CZM) and various private organizations to bring the Bakers' pier project under MEPA review. On October 26, 1992, ten members of the Massachusetts Audubon Society, armed with information provided to them by the defendants, submitted a signed request to the Secretary of Environmental Affairs, Susan Tierney, asking her to require the Bakers to submit an Environmental Notification Form ("ENF") under MEPA. The Bakers contend that, without organized encouragement from the defendants, the ten individuals would not have requested MEPA review.

On November 3, 1992, Assistant Secretary of Environmental Affairs Janet McCabe notified the Bakers of the Fail–Safe request and asked them to provide additional information concerning the proposed project. On November 18, 1992, and December 11, 1992, the Bakers notified Secretary Tierney of alleged misconduct by the other defendants and requested more time to respond. The December 11, 1992, request for additional time was denied. Defendants Tierney and McCabe granted the Fail–Safe request and determined that publication of an ENF should be required. The Bakers submitted the ENF in June 1993. On August 9, 1993, after collecting comments from various individuals and environmental organizations, the new Secretary of Environmental Affairs, Trudy Coxe, determined that the project required the preparation of an Environmental Impact Report ("EIR").[4]

The Bakers filed suit in Suffolk Superior Court to challenge this additional environmental review, arguing that Secretary Coxe had abused her discretion in requiring the EIR and that the scope of the proposed EIR was too broad. *See Baker v. Coxe*, No. 935795C, 1994 WL 878942 (Mass.Super. Dec. 22, 1994). The judge ruled that further environmental review was properly within the discretion of the Secretary but that the additional review should have been limited to the impact of the pier and should not have included the Bakers' past and present forestry practices. *See id.* at *2–*3. After the parties agreed to the superior court judgment, Secretary Coxe determined that no EIR or further review was required.

---

4. Submission of an ENF allows the Secretary to determine whether an EIR should be required.

As noted, a Statement of Consistency was sent several times to CZM. However, it was misfiled, overlooked, or lost. This bureaucratic snafu caused substantial delay. The Army Corps of Engineers eventually issued the pier permit after receiving a favorable consistency review from CZM in 1997. The pier has now been built.

In November 1995, the Bakers brought suit under 42 U.S.C. § 1983, alleging that the eight EOEA defendants violated their due process and equal protection rights by wrongfully denying them a building permit and their First Amendment rights by directly retaliating against them for opposing the ACEC legislation and suing Dr. Parsons. The Bakers also assert various state law claims. This Court dismissed the equal protection and due process claims on September 20, 1996. *See Baker v. Coxe*, 940 F.Supp. 409 (D.Mass.1996). The only remaining § 1983 claim is for violation of the First Amendment right to free speech.

## DISCUSSION

### A. *Summary Judgment Standard*

A motion for summary judgment must be allowed if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "To succeed [in a motion for summary judgment], the moving party must show that there is an absence of evidence to support the nonmoving's party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir.1990); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

"Once the moving party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.'" *Barbour.v. Dynamics Research Corp.*, 63 F.3d 32, 37 (1st Cir.1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

"There must be 'sufficient evidence favoring the nonmoving party for a [reasonable] jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.'" *Rogers*, 902 F.2d at 143 (quoting *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505) (citations and footnote in *Anderson* omitted). All reasonable inferences must be drawn in favor of the nonmoving party, *see, e.g., Barbour*, 63 F.3d at 36, but "those inferences 'must flow rationally from the underlying facts; that is, a suggested inference must ascend to what common sense and human experience indicates is an acceptable level of probability,'" *Rubinovitz v. Rogato*, 60 F.3d 906, 911 (1st Cir.1995) (quoting *National Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 743 (1st Cir.1995)).

### B. *First Amendment Claim*

■ The First Circuit has held that the delay or "denial of a land use permit in unjustifiable retaliation for the applicant's expressions of his political views is a First Amendment violation." *Nestor Colon Medina & Sucesores, Inc. v. Custodio*, 964 F.2d 32, 40–41 (1st Cir.1992) (citing *Packish v. McMurtrie*, 697 F.2d 23, 25 (1st Cir.1983), and *Chiplin Enters. v. City of Lebanon*, 712 F.2d 1524, 1527 (1st Cir. 1983)).

■ In order to establish a prima facie case of retaliation under the First Amendment, the Bakers must demonstrate that (1) they engaged in protected speech, (2) they were qualified for the pier permit, and (3) defendants' actions in delaying the permit through environmental review were motivated by a desire to retaliate against plaintiffs for their speech. *See id.* at 41 (establishing the standards of proof in a retaliation suit by analogizing to the stan-

dards in employment discrimination cases). The fact that other similar projects were not subjected to similar treatment is evidence of possible illegal motivation. *See id.* Defendants may rebut the Bakers' prima facie case "by showing a 'legitimate, non[retaliatory] reason'" for the delay of the permit. *Id.* (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). If defendants make this showing, plaintiffs may then attempt to "show that the alleged non[retaliatory] reason was pretext." *Id.*

### 1. *Protected Speech*

Plaintiffs identify two areas of protected speech that they believe were the catalyst for defendants' efforts to subject the pier proposal to environmental review. Mr. Baker claims that he was an outspoken opponent of the proposed ACEC legislation in 1989. Although the defendants dispute this contention, for the purposes of summary judgment review this Court assumes that Mr. Baker did indeed oppose the ACEC legislation, at least to the extent that it concerned his property. Mr. Baker also contends that defendants retaliated against him for his lawsuit against Dr. Parsons.[5] Defendants do not dispute that these activities by Mr. Baker are protected speech. However, Mrs. Baker has not produced any evidence that she engaged in any protected speech. Therefore, her First Amendment claim is dismissed.

### 2. *Qualified for Permit*

Mr. Baker must also demonstrate that he was qualified for the pier permit without being subject to the MEPA review process and the EIR requirement. *See Custodio*, 964 F.2d at 41 (requiring the plaintiff to show that he was qualified to receive the desired land use permit as part of his prima facie retaliation case). The record adequately supports the claim that the Bakers' permit application would not have automatically been subject to MEPA review absent the intervention of defendants. Instead, had Natural Heritage not requested otherwise, the Army Corps of Engineers would likely have issued the permit without further consideration.

### 3. *Illegal Motive*

Finally, in order to survive summary judgment, Mr. Baker must establish, with sufficient factual support, an inference that "defendants' allegedly retaliatory actions were motivated by the protected speech." *Rubinovitz*, 60 F.3d at 911 (citing *Cloutier v. Town of Epping*, 714 F.2d 1184, 1192 (1st Cir.1983), and *Packish*, 697 F.2d at 26); *see also, e.g., Custodio*, 964 F.2d at 41. A plaintiff must prove that his protected speech was "the substantial or motivating factor" underlying the defendant's conduct. *Kauffman v. Puerto Rico Tel. Co.*, 841 F.2d 1169, 1172 (1st Cir.1988) (citing, *inter alia, Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). This element is the most difficult to substantiate. *C.f., e.g., Stepanischen v. Merchants Despatch Transp. Corp.*, 722 F.2d 922, 929 (1st Cir.

---

**5.** In their pleadings responding to defendants' summary judgment motion, the Bakers cite a third instance of protected speech as well: their allegations to Secretary Tierney in November and December of 1992 of misconduct by the Natural Heritage defendants and defendant McCabe. (Mem.Supp. Pls.' Opp'n to Mot. for Summ.J. at 4, 32–37.) This speech is relevant only with respect to defendants Tierney, McCabe, and Coxe. However, plaintiffs did not raise this issue in their complaint or press it as a theory for relief before this Court during briefing on the motion to dismiss. Therefore I do not consider it so late in the day. This Court allowed defendants' motion for a protective order precluding depositions of Secretary Tierney and Secretary Coxe without prejudice to plaintiffs' right to seek this discovery if they discovered any factual basis for concluding that these top government officials were improperly motivated. *See Church of Scientology v. Internal Revenue Serv.*, 138 F.R.D. 9, 12 (D.Mass.1990). Mr. Baker has moved pursuant to Fed.R.Civ.P. 56(f) to take their depositions based primarily on this new claim (Docket No. 104). Because I do not consider the claim on timeliness grounds, that motion is ***DENIED.***

1983) (observing that, in a discriminatory discharge case, a plaintiff "will rarely, if ever, be able to produce a 'smoking gun' that provides direct, subjective evidence of an employer's . . . intent").

■ A court must be "particularly cautious about granting summary judgment" in discrimination or retaliation cases, in which one party's state of mind or intent is "crucial to the outcome." *Id.* at 928; *see also, e.g., Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997); *Geier v. Medtronic, Inc.,* 99 F.3d 238, 240 (7th Cir. 1996); *Hossaini v. Western Mo. Med. Ctr.,* 97 F.3d 1085, 1088 (8th Cir.1996) (recognizing "the difficulty of disposing of issues of discriminatory or retaliatory intent at the summary judgment stage").

However, even in such cases, "a plaintiff must provide more than conclusory allegations of [retaliation] to defeat a motion for summary judgment." *Schwapp,* 118 F.3d at 110; *see also e.g., Pilgrim v. Trustees of Tufts College,* 118 F.3d 864, 870–71 (1st Cir.1997) ("[The summary judgment standard articulated in Fed.R.Civ.P. 56(c) ] is applicable even . . . 'where elusive concepts such as motive or intent are at issue . . . .'" (quoting *Lehman v. Prudential Ins. Co. of Am.,* 74 F.3d 323, 327 (1st Cir.1996))); *Stepanischen,* 722 F.2d at 929. Absent direct evidence of retaliatory intent, a plaintiff must attempt to support an inference of illegal motive by pointing to the divergent treatment of similar permit applications. *See, e.g., Custodio,* 964 F.2d at 41–42. According to the First Circuit, the fact that other applicants "with no different qualifications" were granted permits is the "most critical" indicator of a retaliatory motive. *Id.* (finding "the possibility of an illegal motive" where the plaintiff's permit was denied "despite the routine grant of similar requests").

In order to make out this element of his claim, Mr. Baker must show that each of the defendants knew of the protected speech. Without knowledge of the protected speech, defendants could not possibly have retaliated on the basis of that speech. Plaintiff wishes the Court to draw several inferences from the record regarding which defendants can be imputed with the requisite knowledge. At best, the evidence shows that defendant Copeland was aware in the early stages of the Bakers' permit application process of Mr. Baker's opposition to the ACEC legislation and that he made a written notation of the opposition in Natural Heritage's Clark's Island Review file, which defendant Thomas French admitted he read in February of 1994. There is no evidence that either French or Copeland supported the legislation. There is no direct evidence that any of the other defendants knew of Mr. Baker's position until the current litigation, and plaintiff does not suggest that defendants Tierney, McCabe, or Coxe knew of, or were motivated by, his position.

As to Mr. Baker's suit against Dr. Parsons, the record reflects that defendants French and Huckery learned of the suit shortly after it was threatened in December 1991 and that McCabe learned of it after the ten citizens initiated the MEPA Fail–Safe request, but that the remaining defendants did not know of it until this lawsuit or until after their involvement with the pier project had ended. Therefore, with respect to Coxe, Tierney, Blodget, and Mead, there is insufficient evidence from which a jury could find that they knew of either of the alleged catalysts for the retaliatory action. Mr. Baker claims that defendant Jane Mead of CZM delayed issuance of the pier permit by falsely claiming that she had not received a Consistency Statement in retaliation for his exercise of First Amendment rights. However, there is no evidence that Mead ever had the Statement.

■ With respect to the remaining defendants, Mr. Baker's First Amendment claim fails because he cannot demonstrate that defendants' actions were illegally motivated and because, in any event, defendants have offered a legitimate, nonretaliatory reason for their actions. Lacking any

direct evidence of impermissible motive, Mr. Baker identifies eleven construction projects that he proposes are sufficiently similar to the planned pier to raise an inference of retaliation in this case. Most of these projects involved increased human activity near bird colonies. Defendants and other individuals and organizations expressed concern about the environmental impact of a number of the projects. Unlike the Baker pier application, however, none of the projects was subjected to MEPA Fail–Safe review.

Mr. Baker's asserted circumstantial evidence of retaliation is not compelling. Of the eleven other projects plaintiff describes, only four were major projects near heron colonies and are worthy of comparison: dredging and navigation improvements near a Black–Crowned Night Heron colony at Tashmoo Pond, Martha's Vineyard; a residential development near a Great Blue Heron colony in Dunstable and Tyngsboro; land clearing near a Black–Crowned Night Heron colony in Yarmouthport; and a residential development near a Great Blue Heron colony at Witch Brook in Townsend. Two of these four projects—the ones at Tashmoo Pond and in Yarmouthport—appear to have concerned heron roosteries, which are perching or resting areas, as opposed to heronries, which are breeding and nesting grounds. The undisputed testimony of defendant Blodget, the State Ornithologist, indicates that heronries are more fragile than roosteries in terms of their susceptibility to human activity and that the "displacement of herons from roosteries [is] not of great concern." (Supplemental Blodget Aff. at 4.) In any event, the Tashmoo Pond project occurred in 1977, nearly fifteen years before the permit application in this case, and is too temporally remote to be relevant. Therefore, these two projects should be treated as red herons.

The Dunstable/Tyngsboro and Townsend projects come closer to the mark. They were likely to generate human activity around heronries, as opposed to roosteries, and involved the potential for land and brush clearing to make room for the homes. However, the Dunstable/Tyngsboro development in 1984, like the Tashmoo Pond project, occurred before Natural Heritage became involved with MEPA review and thus cannot support plaintiff's allegation of differential treatment. This leaves the Townsend housing construction project, which was in close proximity to the heronry of Witch Brook and harbored a single, common, and adaptable species of Great Blue heron, as the closest comparison. The Natural Heritage defendants claim that they were able successfully to suggest ways in which the project proponent could create buffer zones and mitigate the environmental effects of the development before construction even occurred.

Defendants also contend that the Clark's Island heronry was unique because of its size and the diversity of species[6] it supported. According to Blodget, the Clark's Island heronry was one of the largest breeding colonies of wading birds. Also, defendants emphasize the extensive destruction of the habitat prior to environmental review. Blodget believed that the heronry could be revitalized, if revegetated, although it could take a lifetime. The reasons for this destruction are hotly contested. Defendants believe that the tree farm activities caused the destruction of the heronry. The Bakers claim that they did not destroy the heronry by "bush-hogging," and for purposes of this motion it must be assumed that they did not. Not disputing that the breeding area had been destroyed, they assert that the stripping of the coastal bank was caused by cormorants

---

6. The heronry supported the Black–Crowned Night Heron, the Snowy Egret, Great Egrets, and the Blue Heron. Mr. Baker claims that any proffered concern about the Black–Crowned Night Heron is a pretext because of efforts to reduce (about which Blodget has written) this kind of heron to protect the Roseate Tern, a protected species, from predation.

and other natural causes. Even if defendants were mistaken that the tree logging activities had destroyed the heronry, this mistaken basis for animosity toward the pier project is not unlawful motivation for First Amendment purposes. The bottom line is that Mr. Baker has not pointed to any project that is sufficiently similar to the proposed pier or any other substantial evidence to raise the necessary inference of improper motive.

Plaintiff also urges this Court to find circumstantial evidence of retaliation from the chronology of events in this case. Courts have held that mere chronology is insufficient to support an inference of retaliatory motive and that instances of protected activity and allegedly retaliatory acts separated by intervals of even three to six months are "not temporally close enough to support an inference of causal connection." *Balletti v. Sun–Sentinel Co.*, 909 F.Supp. 1539, 1549 (S.D.Fla.1995) (citing numerous cases); *see also Packish*, 697 F.2d at 26–27 (upholding a grant of summary judgment to defendants where denial of indemnification "came well over a year after publication of the letters against which it was allegedly in retaliation"). Plaintiff's contention rings hollow with regard to the ACEC legislation, as two years elapsed between Mr. Baker's opposition to the legislation and defendants' involvement with the proposed pier.

However, Mr. Baker also points to the fact that the Natural Heritage defendants sought MEPA review of the pier project shortly after Mr. Baker threatened to sue Dr. Parsons. He acknowledges that these defendants had opposed the project before the litigation, but argues that the animosity and consequent effort to subject the pier to environmental review intensified as a result of the suit. Like other courts, the First Circuit has held that, "in response to a summary judgment motion, mere temporal proximity" between an instance of pro-

tected speech and an allegedly retaliatory act is insufficient to raise a genuine issue as to a defendant's motivation. *Aviles–Martinez v. Monroig*, 963 F.2d 2, 5 (1st Cir.1992) (citing *Kauffman*, 841 F.2d at 1172). This is especially the case when the defendant's activity "had been well underway" at the time of the protected speech, unless the plaintiff can demonstrate a marked change in the defendant's attitude. *Rubinovitz*, 60 F.3d at 911 (finding that plaintiffs had "offer[ed] no basis upon which to distinguish pre- and post-[speech] harassment" where the protected speech occurred four months into defendants' ongoing investigation of plaintiffs' activities).

Here, Natural Heritage had been pursuing further review of the Bakers' project for at least several months before Mr. Baker's threatened lawsuit. Plaintiff alleges that the Natural Heritage defendants responded to the threat by instigating MEPA review in violation of their own policy not to engage in pre-ENF environmental review. However, the evidence does not support an inference that such a policy existed at Natural Heritage at the time of the Bakers' permit application in 1991.[7] Plaintiff also claims that defendants retaliated for the Parsons suit by explicitly pressuring the Army Corps of Engineers not to issue the permit. Even if, as the record tends to suggest, defendants "attempted to influence the [Army Corps] permitting process, this interference could just as likely—or more likely— have been based on the [agency's] ... hostility to the project as on retaliation" for the suit. *Custodio*, 964 F.2d at 42; *see also Cloutier*, 714 F.2d at 1192 n. 8 (noting, in a case in which "plaintiffs argued that defendants violated section 1983 by speaking out against plaintiffs' development plans," that the First Amendment "protects [the right of] the defendants as well as the plaintiffs ... to engage in the rough and tumble of political debate and action,

---

7. There was a policy in favor of pre-ENF environmental review, which French proposed changing in 1989. By 1992, Natural Heritage had changed the policy. However, it is unclear from the record exactly when the policy switched.

based on their personal views" (citing *FTC v. Cement Inst.*, 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010 (1948))). Mr. Baker's "perception" of the events "is not enough to withstand summary judgment." *Pilgrim,* 118 F.3d at 871. I conclude that plaintiff has failed to establish that defendants' actions in seeking environmental review, including MEPA review, were illegally motivated.

### 4. *Legitimate, Nonretaliatory Reason for Heightened Environmental Review*

█ Even if Mr. Baker had sufficiently established the necessary elements of a prima facie case, defendants have asserted a compelling nonretaliatory reason in rebuttal, one that plaintiff has done little to counter—the concern that the project would facilitate the Bakers' tree farming activities. The record is replete with evidence that defendants' primary reason for opposing the Bakers' project was not the environmental impact of the proposed pier itself, but of the secondary activities (tree and brush clearing) it would support. Once the Superior Court made clear that a review or curtailment of the Bakers' forestry practices was legally impermissible, defendants abandoned their effort to obtain an EIR or any further review.

Given this evidence and Natural Heritage's role as an advocacy organization, there is no evidence that defendants' concern for the vitality of the heronry was a pretext. As compared to plaintiff's contentions—that defendants were motivated by Mr. Baker's dated and somewhat elusive opposition to unrealized legislation and by Mr. Baker's suit against Dr. Parsons, threatened after defendants had already expressed opposition to the proposed pier—defendants' explanation "seems both the most logical inference and one that is wholly consistent with the alleged [delays and] irregularities" in defendants' review process. *Custodio,* 964 F.2d at 39, 43 (holding that the plaintiff's First Amendment retaliation claim regarding a waste disposal permit "fail[ed] for lack of evidence that whatever shortcomings and irregularities occurred were in retaliation for [his] personal political views"); *see also Cloutier,* 714 F.2d at 1192 ("It is difficult to infer that defendants were motivated by dislike of plaintiffs' exercise of free speech rather than simply by disapproval of the proposed [pier]."); *cf. Pilgrim,* 118 F.3d at 871 ("The only inference that can be drawn ... is that for whatever reason [plaintiff] received different treatment, it was as likely due to a clash of personalities as [racial discrimination].").

In sum, defendants may be charged with zealously advocating for additional environmental review of the Bakers' pier permit application, even in violation of state laws governing the proper scope of an EIR, *see Baker,* 1994 WL 878942, at *2–*3, but there is no evidence from which a jury could reasonably infer that they did so as a result of plaintiff's speech.

### C. State Law Claims

Mr. Baker's First Amendment claim provides the sole basis for him to allege federal question jurisdiction. The Court has discretion to decline supplemental jurisdiction over pendant state law claims when it has "dismissed all claims over which it ha[d] original jurisdiction." 28 U.S.C. § 1367(c)(3); *see also Mercado-Garcia v. Ponce Fed. Bank,* 979 F.2d 890, 896 (1st Cir.1992). Accordingly, Mr. Baker's state law claims are dismissed without prejudice.

### ORDER

Because I conclude that no genuine issue of material fact exists as to defendants' motivation for pursuing environmental review of plaintiffs' pier project, defendants' motion for summary judgment (Docket No. 84) is *ALLOWED.* The state claims are dismissed without prejudice.